UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PASCUAL GOSSELIN, | 1:10-cv-01974-GSA-PC |
| Plaintiff, | ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 43.) |
| vs. | |
| LIEUTENANT R. HUBACH, | ORDER ENTERING SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS |
| SERGEANT J. TABER, | |
| SERGEANT D. LATRAILLE, AND | ORDER FOR CLERK TO CLOSE CASE |
| WARDEN D. ADAMS, | |
| Defendants. | |

I.     **BACKGROUND**

Pascual Gosselin ("Plaintiff") is a state prisoner proceeding pro se with this civil rights action pursuant to 42 U.S.C. § 1983.  Plaintiff filed the Complaint commencing this action on October 12, 2010.  (ECF No. 1.)  This action now proceeds on the First Amended Complaint filed by Plaintiff on December 29, 2012, against defendants Lieutenant R. Hubach, Sergeant J. Taber, and Sergeant D. LaTraille for adverse conditions of confinement, in violation of the Eighth Amendment; against defendants Sergeant J. Taber and Sergeant D. LaTraille for use of excessive force against Plaintiff, in violation of the Eighth Amendment; against defendant Lieutenant R. Hubach for failure to protect Plaintiff, in violation of the Eighth Amendment; and

1

against defendant Warden D. Adams for implementation of policy violating Plaintiff's rights under the Fourth Amendment and rights to privacy.[1]  (ECF No. 11.)

The parties to this action have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c), and therefore the undersigned shall conduct any and all proceedings in the case, including trial and entry of final judgment.[2]  (ECF Nos. 6, 33.)

On February 17, 2015, defendants Adams, Hubach, LaTraille, and Taber ("Defendants") filed a motion for summary judgment.[3]  (ECF No. 43.)  On August 3, 2015, Plaintiff filed an opposition to the motion.  (ECF No. 57.)  On August 11, 2015, Defendants filed a reply to Plaintiff's opposition.  (ECF No. 59.)

Defendants' motion for summary judgment is now before the court.  Local Rule 230(*l*). For the reasons that follow, the court recommends that Defendants' motion be granted.

## II.   PLAINTIFF'S CLAIMS AT ISSUE[4]

Plaintiff is presently incarcerated in the custody of the California Department of Corrections and Rehabilitation (CDCR) at the California Correctional Institution in Tehachapi, California.  The events at issue allegedly occurred at Corcoran State Prison (CSP) in Corcoran, California, when Plaintiff was incarcerated there.  Plaintiff's factual allegations follow.

Prior to the events at issue, unclothed body searches, or strip searches, were conducted in rotunda holding cells prior to inmates going to and returning from the outdoor exercise yard, in compliance with state and prison policy.  The Department Operations Manual requires that

---

[1] On May 1, 2013, the court issued an order dismissing all other claims and defendants from this action based on Plaintiff's failure to state a claim under § 1983.  (ECF No. 12.)

[2] Plaintiff filed a consent form on November 8, 2010.  (ECF No. 6.)  On March 21, 2014, Defendants consented to the jurisdiction of Magistrate Judge Gary S. Austin only.  (ECF No. 33.)

[3] Concurrently with their motion for summary judgment, Defendants served Plaintiff with the requisite notice of the requirements for opposing the motion.  Woods v. Carey, 684 F.3d 934, 939-41 (9th Cir. 2012); Rand v. Rowland, 154 F.3d 952, 960-61 (9th Cir. 1998).

[4] Plaintiff's First Amended Complaint is verified and his allegations constitute evidence where they are based on his personal knowledge of facts admissible in evidence.  Jones v. Blanas, 393 F.3d 918, 922-23 (9th Cir. 2004).  The summarization of Plaintiff's claims in this section should not be viewed by the parties as a ruling that the allegations are admissible.  The court will address, to the extent necessary, the admissibility of Plaintiff's evidence in the sections which follow.

the searches be conducted "in an area that allows the inmate to preserve some measure of dignity and self respect;" California regulations require that the searches "be conducted in a professional manner which avoids embarrassment or indignity to the inmate and whenever possible shall be conducted outside the view of others;" and CSP's Operations Procedure Manual requires that the searches "be conducted in a holding cell which affords some measure of privacy." (First Amd Cmp (FAC), ECF No. 11 at 7 ¶¶10, 11, 12, and Exhs. C, D, E.)

In February 2008, CSP staff suddenly began conducting unclothed body inspections outside on the yard, pursuant to a memorandum authored by defendant Warden Adams which stated, in part:

> "Effective August 20, 2007, Inmates in the SHU shall undergo an unclothed body search prior to removal from their cell or the Small Management Yard (SMY). This security measure will assist in ensuring inmates are free of all contraband prior to escort."

(Exh. F to FAC at 53.) As a result of this memorandum, Plaintiff was forced to strip completely naked in a filthy yard cage filled with insects and bird feces, and in plain view of a yard of inmates and staff of the opposite sex. In winter, temperatures regularly drop as low as 30 degrees, with rain and wind. Plaintiff has been forced to submit to searches in puddles of water. Plaintiff describes the searches as embarrassing, degrading, and unsanitary.

Plaintiff and other inmates filed a group prison grievance complaining about the searches. On March 12, 2008, Chief Deputy Warden Junious (not a defendant) responded to the grievance, informing the inmates that female staff would not be present during strip searches, and privacy screens would be installed to obscure the view from the Facility Program Office.

On March 15, 2008, at approximately 3:30 p.m., after Plaintiff's outdoor exercise in the yard, Correctional Officer Silva (not a defendant) ordered Plaintiff to strip outdoors, in a filthy and unsanitary environment, and refused to remove him from the exercise yard until he complied. Plaintiff refused, explaining that he was willing to submit to an unclothed body search if conducted in the unit holding cages, not visible to other staff and inmates, and out of the cold weather. Plaintiff's request was disregarded, and he was left outside in the cold

weather overnight until 4:30 a.m. the next morning.  During this time, Plaintiff was denied food and warm clothing.  Plaintiff was only wearing a thin pair of boxer shorts and a t-shirt, and was forced to spend 16 hours in windy, 30-degree weather.  Plaintiff asked defendants Lieutenant Hubach and Sergeant LaTraille if he was going to be fed or provided with warm clothing, and was told he "didn't have anything" coming unless he stripped out.  (FAC at 10 ¶22.)

While Plaintiff was outside in the yard, defendant Hubach ordered the removal of all of Plaintiff's property from his cell, without any notice or hearing, out of retaliation and punishment for Plaintiff's refusal to be searched outside.  Plaintiff's tennis shoes and clothing were never returned to him.

On March 16, 2008, following an order authorized by Administrative Officer Leon (not a defendant), defendant Hubach ordered the use of excessive force against Plaintiff to force him to comply with the outdoor search.  After the order, defendants LaTraille and Taber attacked Plaintiff and his cellmate with a total of nine canisters of pepper spray.  They initially sprayed six canisters, until Plaintiff was drenched in pepper spray, after which Hubach said, "Let them soak for awhile."  (FAC at 11 ¶24.)   Defendants Hubach, LaTraille, and Taber then left Plaintiff to extract the next SMY yard, and LaTraille and Taber later returned to spray Plaintiff with three more canisters of pepper spray.  Plaintiff's entire body, face, back, legs, genitals, and anus were completely saturated with toxic chemicals, causing him to burn as if on fire.  Plaintiff could not tolerate the burning, and so he submitted to the search.  After the search, Plaintiff was given the same pair of boxer shorts to wear and was handcuffed, and he and his cellmate were escorted to the front of the building for decontamination.  Plaintiff observed his cellmate being sprayed for approximately 60 seconds with a low-pressure garden hose in the cold weather, which was not enough to remove the pepper spray and only caused the chemicals to run down his head into his eyes, causing him to be unable to see.   When it was Plaintiff's turn to decontaminate, he asked for a shower instead and declined to be sprayed with the hose.  Plaintiff was not given a shower.

Plaintiff was then placed in a cell with only a bare mattress.  By now, Plaintiff could not see, his breathing was erratic, his heart was pounding, and his body was twitching

uncontrollably from the chemicals.   Plaintiff had nothing but water in the cell to self-decontaminate.   Plaintiff asked defendant Hubach for a shower, but then Plaintiff's tray slot was closed and all staff left him in his cell for three days.   Plaintiff attempted to wash off the pepper spray with water, but his entire body was saturated and burning.   Plaintiff was refused a shower even though all six showers in the unit were empty and never used.

At breakfast time on March 17, 2008, Plaintiff told floor staff that his entire body was on fire and he needed to be properly decontaminated.   C/O Longoria [not a defendant] told him the staff's supervisors (Jennings [not a defendant], Hubach, LaTraille, and Taber) said "No." (FAC at 13 ¶28.)   Plaintiff asked for a piece of soap to clean himself, a spoon to eat his meal, and some clothing, but Longoria again told Plaintiff the supervisors would not allow it.   Several hours later, fellow inmates gave Plaintiff soap and a pair of boxers.   On March 18 or 19, 2008, Plaintiff's property was returned to him, damaged and in disarray.   Defendants continued to conduct public strip searches in unsanitary conditions.

The court found that Plaintiff stated cognizable claims in the First Amended Complaint against defendants Hubach, Taber, and LaTraille for adverse conditions of confinement; against defendants Taber and LaTraille for use of excessive force; against defendant Lieutenant R. Hubach for failure to protect Plaintiff; and against defendant Warden D. Adams for implementation of policy violating Plaintiff's rights under the Fourth Amendment and rights to privacy.   (ECF No. 12.)

## III.   SUMMARY JUDGMENT STANDARD

Any party may move for summary judgment, and the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mutual Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).   Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence

to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); <u>Carmen v. San Francisco Unified School Dist.</u>, 237 F.3d 1026, 1031 (9th Cir. 2001); accord <u>Simmons v. Navajo County, Ariz.</u>, 609 F.3d 1011, 1017 (9th Cir. 2010).

Defendant does not bear the burden of proof at trial and in moving for summary judgment, he need only prove an absence of evidence to support Plaintiff's case. <u>In re Oracle Corp. Securities Litigation</u>, 627 F.3d 376, 387 (9th Cir. 2010) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986)). If Defendant meets his initial burden, the burden then shifts to Plaintiff "to designate specific facts demonstrating the existence of genuine issues for trial." <u>In re Oracle Corp.</u>, 627 F.3d at 387 (citing <u>Celotex Corp.</u>, 477 U.S. at 323). This requires Plaintiff to "show more than the mere existence of a scintilla of evidence." Id. (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252, 106 S.Ct. 2505 (1986)).

In judging the evidence at the summary judgment stage, the court may not make credibility determinations or weigh conflicting evidence, <u>Soremekun v. Thrifty Payless</u>, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, <u>Comite de Jornaleros de Redondo Beach v. City of Redondo Beach</u>, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted), cert. denied, 132 S.Ct. 1566 (2012). The court determines only whether there is a genuine issue for trial and in doing so, it must liberally construe Plaintiff's filings because he is a pro se prisoner. <u>Thomas v. Ponder</u>, 611 F.3d 1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

## IV.   DEFENDANTS' MOTION

Defendants make the following arguments in support of summary judgment: (1) the strip-search policy was reasonable and advanced a legitimate correctional purpose; (2) Defendants' use of force to compel Gosselin's compliance with the strip-search policy was reasonable and applied in a good faith effort to restore order; (3) Gosselin did not inform any Defendant that he needed food, clothing, or further decontamination; (4) Defendants are

entitled to qualified immunity since they did not violate Gosselin's constitutional rights and their conduct was objectively reasonable; and (5) Gosselin did not file a government claim before filing this action thus precluding his state-law claims.  Defendants submit as evidence the Declarations of D. Adams, R. Hubach, D. LaTraille, J. Taber, and Diana Esquivel; Exhibits A-R attached to Diana Esquivel's Declaration, including a transcript of Plaintiff's deposition (Exh. R); and a DVD video recording of Plaintiff's extraction.

> ### A.    Unclothed Body Search Policy – Fourth Amendment and Right to Privacy

> #### 1.    Legal Standard

"[C]onvicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." Bell v. Wolfish, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877 (1979).  However, "[t]he limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives-including deterrence of crime, rehabilitation of prisoners, and institutional security."  O'Lone v. Estate of Shabazz, 482 U.S. 342, 107 S.Ct. 2400, 2404 (1987).  "The Supreme Court emphatically set forth the standard for reviewing alleged infringements of prisoners' constitutional rights." Michenfelder v. Sumner, 860 F.2d 328, 332 (9th Cir. 1988).  "In Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 2260-61, 96 L.Ed.2d 64 (1987), the Court rejected a standard of heightened scrutiny in favor of the following rational relationship test:  'when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.'"  Id. (citing see also O'Lone, 107 S.Ct. at 2404).  "The Court provided four factors to guide reviewing courts in applying this test:  1) the existence of a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; 2) the existence of alternative means of exercising the right that remain open to prison inmates; 3) the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and 4) the absence of ready alternatives as evidence of the reasonableness of the regulation (the presence of obvious easy alternatives may evidence the opposite)."  Id. (citing Turner, 482 U.S. at 89-90,107 S.Ct. at 2262).

In applying the <u>Turner v. Safley</u> test, [the court] must accord great deference to prison officials' assessments of their interests:  "Prison administration is ... a task that has been committed to the responsibility of [the legislative and executive branches], and separation of powers concerns counsel a policy of judicial restraint.  Where a state penal system is involved, federal courts have, as [the Court] indicated in [<u>Procunier v.</u>] <u>Martinez</u> [416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974)], additional reason to accord deference to the appropriate prison authorities."  <u>Turner</u>, 482 U.S. at 84,107 S.Ct. at 2259.

The Fourth Amendment guarantees "[t]he right of the people to be secure ... against unreasonable searches and seizures."  U.S. Const. amend. IV.  "This right extends to incarcerated prisoners; however, the reasonableness of a particular search is determined by reference to the prison context."  <u>Michenfelder</u>, 860 F.2d at 333.  "In <u>Bell v. Wolfish</u>, 441 U.S. 520, 558, 99 S.Ct. 1861, 1884 (1979), the Supreme Court set forth a balancing test for determining a search's reasonableness:  'The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.  In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.  Courts must consider the *scope* of the particular intrusion, the *manner* in which it is conducted, the *justification* for initiating it, and the *place* in which it is conducted.'"  <u>Id.</u>  (citing <u>Bell</u>, 441 U.S. at 559 (emphasis added)).  In analyzing these factors, the cross-gender nature of the search is a critical consideration.  <u>Byrd v. Maricopa Cnty. Sheriff's Dep't.</u>, 629 F.3d 1135, 1143 (9th Cir. 2011) (en banc), cert. denied, ---- U.S. ----, 131 S.Ct. 2964, 180 L.Ed.2d 246 (2011).  The "litany of cases over the last thirty years has a recurring theme: cross-gender strip searches in the absence of an emergency violate an inmate's right under the Fourth Amendment to be free from unreasonable searches."  <u>Id.</u> at 1146.

"Visual body cavity searches conducted after contact visits as a means of preventing prisoners' possession of weapons and contraband, even absent probable cause, have been found reasonable by the Supreme Court."  <u>Michenfelder</u>, 860 Fed.2d at 332 (citing <u>Bell</u>, 441 U.S. at 558-60.  "In <u>Rickman v. Avaniti</u>, the Ninth Circuit approved strip searches that were conducted every time prisoners in administrative segregation left their cells for any purpose."  <u>Id.</u>  "[S]o

long as a prisoner is presented with the opportunity to obtain contraband or a weapon while outside of his cell, a visual strip search has a legitimate penological purpose.  Id. at 333 (citing Turner, 482 U.S. at 88, 107 S.Ct. at 2261).  With respect to the place strip searches are conducted, Turner's third and fourth factors – the impact on prison personnel and the allocation of prison resources generally, and the presence or absence of ready alternatives – must be considered.  Id.

"[I]ncarcerated prisoners retain a limited right to bodily privacy.  Michenfelder, 860 F.2d at 333.  "Shielding one's unclothed figure from the view of strangers, particularly strangers of the opposite sex is impelled by elementary self-respect and personal dignity."  Id. at 333-34 (citing Grummett v. Rushen, 779 F.2d 491, 494 (9th Cir.1985); see also Cumbey v. Meachum, 684 F.2d 712, 714 (10th Cir.1982) ("Although the inmates' right to privacy must yield to the penal institution's need to maintain security, it does not vanish altogether.").  "[The court uses Turner's] rational relationship test to determine whether [the] impingement on inmates' right to privacy by employing females is 'reasonably related to legitimate penological interests.'"  Id. (quoting Turner, 482 U.S. at 87-89,107 S.Ct. at 2260-61).  The Ninth Circuit "has found that assigned positions of female guards that require only infrequent and casual observation, or observation at a distance, and that are reasonably related to prison needs are not so degrading as to warrant court interference."  Id. at 334 (citing Grummett, 779 F.2d at 494-95).

### 2.    Defendants' Arguments

**Defendant Adams**

Defendants argue that defendant Adams did not violate Plaintiff's Fourth Amendment or privacy rights because the unclothed body search policy was reasonable and advanced a legitimate correctional purpose.  Defendants argue that defendant Adams' policy was justified because it advanced the prison's interest and need to control the movement of contraband and reduce the risk of violence in the SHU.

As for the location of the searches, Defendants argue that although the SMY was in view of inmates in adjoining cages and staff that may have been in the vicinity, the brevity of

the search and the need to protect staff and inmates from the movement of contraband (and violence that ensued) outweighed the limited invasiveness of conducting the search in the modules.

With respect to Plaintiff's allegations that the strip searches on the yard resulted in his being seen naked by members of the opposite sex, Defendants argue that these allegations demonstrate no more than the type of "casual observation" that the Ninth Circuit has upheld against constitutional challenges.

Defendants argue that Plaintiff's claim arising from any unclothed search he underwent after March 16, 2008 lacks merit because the privacy screens reduced (if not, eliminated) the risk of female staff observing his naked body and provided privacy during the unclothed searches.  Further, the searches became even less intrusive in 2009 when the procedure was changed, allowing inmates to keep their socks on and to briefly drop their boxers rather than removing them.

Thus, Defendants argue that under the <u>Bell</u> and <u>Turner</u> factors, the strip search directive by defendant Adams in August 2007 was reasonable and advanced a legitimate penological goal.

Defendants' evidence includes Plaintiff's Deposition testimony, the Declarations of Adams and Hubach, and supporting exhibits.

Testimony from Plaintiff's Deposition follows.

Q.      When you were – before March 15th – why don't you describe for me when you were searched when you were going out to yard.

A.      When I was searched?

Q.      Yes.

A.      When the officer came to my cell, he would open the tray slot.  Asked me if I was going to yard.  I would say yes.  You hand your clothing through the tray slot until you're nude and you do the strip search.

Q.      And how long did the whole strip search take?

A.      A minute.  About a minute.

Q.      Was there – was there any physical contact between you and the officer that was strip-searching you?

1      A.      No.

2      Q.      And then you would be escorted out to the exercise modules in the yard?

3      A.      Yes.

4  ((Plaintiff's Deposition of August 13, 2014, at 25:1-18, ECF No. 43-7 at 115.)

5      Q.      In this lawsuit are you claiming that female officers did the actual strip searches of you either before or after March 15th, 2008?

6

7      A.      Of me, no. I didn't see any female officers. I know that female officers were stripping people out there. I mean, that was – that was happening, but as far as me on this specific day, no.

8

9      Q.      Okay. Like I said, not the specific day. I'm just saying any time before or after March 15th, were you ever strip-searched by a female officer?

10      A.      Not that I recall, no.

11  (<u>Id.</u> at 27:14-25, ECF No. 43-7 at 115.)

12      Q.      As you sit here today, have you learned from any source, whether someone told you or you read it anywhere, the reason why Adams decided that the SHU procedure for the searches should change, thus requiring a strip search before you exit the exercise module?

13

14

15      A.      No.

       Q.      Please tell me what it is that the presence of the female guards, how it violates – how you feel it violates your right to privacy.

16

17      A.      For me – I know what other people claim. As far as me, it's not really about the female guards. It's just that we're in the middle – you got everybody passing by. You got the nurses passing by. You got everybody just passing right by the cages because they're by two roadways. And obviously, they later felt the same because they built privacy screens after these extractions. They built privacy screens to separate these – because everybody that goes, whether it's the secretaries, the nurses, I could be stripping out and they're walking right past the roadway. Not no more because they built privacy screens now, but before this incident when there was no privacy screens, then it was like that. So the lady that works at canteen, the lady that's walking by with my canteen, yeah, we're all buck naked.

18

19

20

21

22

23  (<u>Id.</u> at 97:10-98:12 ECF No. 43-7 at 128.)

24      Q.      And I don't have it in front of me, but I know I provided it to you because you requested it in discovery, is the invoice showing when the privacy screens were installed, and it was like a couple of months after March 2008. Is that your recollection, they came up pretty soon after?

25

26

27      A.      Yeah.

28  (<u>Id.</u> at 100:6-13, ECF No. 43-7 at 128.)

Q.      What is the closest, as far as distance is concerned, proximity that a female staff member or visitor was to your exercise module when you had to undergo the strip search?

A.      On March 15th or 16th or just any time?

Q.      At any time after that, before the privacy screens came up.

A.      Twenty feet.

Q.      And what was that female doing?  Was she just passing by?  Was she actually standing there, staring at you?

A.      It's a roadway.  It's just they – people are going to offices.  People are going to buildings.  There's counselors.  They use that little pathway.

Q.      Okay.  Have you ever – from the time of March 16th to the time that the privacy screens came up, have you ever – had you ever experienced a situation where a female staff member or visitor stopped, looked at you and made any kind of comment while you were being subjected to the strip search?

A.      No, not that I recall.  No.

Q.      Okay.  I just want to make sure.  I just want to clarify what your allegations are.

A.      I don't think that female staff are purposely just ogling.  I'm not saying that.  What I'm saying is Adams was forcing us to strip out outside when it's cold, when it's raining, barefoot, in view of everything.  And he had an alternative, which was the rotunda.  And once – it's not like we're going to pass drugs, pass knives.  We're being placed in handcuffs.  How many knives do you find on March 15th and March 16th?

Q.      So let me ask you between March 16th and the time that the privacy screens came up, is it fair to say that on all those occasions that you saw female staff or visitors in the area, they were just going about their business, just passing by or going about their business, going wherever they had to go, using the pathway outside of your exercise module?  Is that fair?

A.      Is what fair?  Say that again.

Q.      On those instances that you have in your mind, from the time of March 16th to the time the privacy screens came up, that when there were female staff members or visitors present, they were passing by?  It's not that they stopped and gawked at you in any way; is that fair?

A.      Yes, it's fair.

(Id. at 102:10-104:6, ECF No. 43-7 at 129.)

Q.      When did you leave Corcoran?

A.      On May 7th of 2014.

Q.      Were you in the SHU when you left Corcoran earlier this year?

A.      Yes.

Q.      Did you – from March 16th to the time you left the SHU at Corcoran, did you continue to undergo unclothed body searches every time you were removed from the exercise modules?

A.      They kind of like altered it.  They don't make us get completely naked anymore.  What they do is make you drop your boxers.  You don't have to get completely naked.  They don't make us take off our socks.  They kind of like do about half.

Q.      Do you recall when that – as opposed to completely stripping out and removing your shoes and socks, when that changed?

A.      Once Adams left.

Q.      When was that?

A.      I think about 2009, somewhere around there.

Q.      So would it be fair that for a couple of months before he left?  Or you tell me because I don't know what you have in mind of how long you were subjected to a full strip search where you were required to take off your shoes and your socks.

A.      I think for a good while after, we were required to do the whole thing.  If not because of policy, but just out of like spite a little bit.  So just – in other words, "Hey, you guys are going to do it," so we did it.  They continued with that policy and slowly it just – just like how I said, before this one day, that policy already existed since 2007, you said.  Right?  But it was never enforced.  Nobody really sweated it.  Every once in a while, a cop would take you in and strip you out in the rotunda, but that's if he suspected something, if he felt like enforcing that policy, but for the most part, most cops didn't do it.  I never got stripped out in there until this day.

Q.      From the time that, as you said, Adams left and it changed such that it became kind of like a partial strip search as opposed to having taken everything off – from March 16th to the time that your being strip-searched changed, were the searches different in any way in terms of the amount of time that it took, whether you had to spread your cheeks, open your mouth, do anything different than what you described earlier as to the type of strip search you'd undergo in your cell?

A.      As to what we would do in our cell or as to what we used to do before?

Q.      No.  The way you did it in your cell, the way you described for me earlier in the deposition.

A.      Yes.  It's –

Q.      Was there a difference?

1   A.   Yes.

2   Q.   What was the difference?

3   A.   We didn't have to take our boxers off.  We'd just kind of like lower them
        and just go.  We didn't have to spread our butts.  We didn't have to take
4       our boxers off.  We didn't have to take our socks off.  Our boxers didn't
        have to come off.  We weren't being placed completely nude.  Now,
5       that's not a hundred percent of how we wanted it but –

6   Q.   Okay.  I'm sorry.  I'm confused.  So in the exercise – again, I'm just
        talking about the period of March 16th to the point that the searches, you
7       said, changed after Adams left.

8   A.   That's what I'm talking about.  That, period.

9   Q.   Just describe for me the average strip search that you underwent when
        you did go to yard.
10
    A.   From March 16th after the extractions until Adams left – or maybe even
11       Adams might have still been there.  I know for a few months they were
        enforcing full – no full stripout.  You didn't have to take off your boxers,
12       your socks, everything.

13  Q.   Did they – at any time did anybody touch you during those searches.

14  A.   No.

15  Q.   Approximately how long did the searches take?

16  A.   A minute.

17  Q.   At any time before it changed completely, either before or after Adams
        left, was there any other change in the way that the searches were done
18       out in the exercise modules?

19  A.   Yes.  Instead of taking our boxers completely off, they would just tell us,
        "Just drop your boxers," and we made a little coughing noise and that's
20       it.

21  Q.   Do you remember how long after March 16th you were allowed to keep
        your boxers on?
22
    A.   Not specifically, no.
23
    Q.   Would it have been in the year of 2008 or would this already have been
24       the following year?

25  A.   No.   I think it would be – have been the following year.  They did it for
        a while, and that search that I just described to you now is what they still
26       do today.

27  (Id. at 104:7-108:7, ECF No. 43-7 at 129-130.)

28  ///

14

Defendant Adams testified as follows:

From January 2006 to December 2009, I was the Warden at California State Prison-Corcoran (COR). ...  On August 1, 2007, I issued a directive requiring that all SHU inmates undergo an unclothed body search before they were removed from the exercise modules on the SMY.  Before August 1, 2007, the unclothed body search was conducted in the rotunda area (hallway) of the housing units.

The change in the location of the unclothed body search was necessary to control and prevent the movement of contraband within the SHU and to protect the institution, staff, and inmates. The SMY were deemed high-risk areas because movement to and from the exercise modules and yard provided inmates with the opportunity to commit assaults, relay information or threats, plan illegal activities, and exchange or obtain weapons or contraband.

Although inmate movement and activities in the SHU were controlled before August 1, 2007, the yards were still experiencing incidents of violence against staff and inmates and contraband, including inmate manufactured weapons, was being discovered during cell searches.  To reduce these illegal activities, I issued the August 2007 memorandum to control and prevent the movement of contraband within the SHU and prison and to protect the institution, staff, and inmates.

An unclothed body search inside the housing unit was not sufficient to protect staff and inmates from assaults or to prevent the movement of contraband. If an inmate was not strip searched before he was removed from the exercise module, he could stab an officer or another inmate, disseminate illegal information, or pass drugs or other contraband at any point that he was removed from the exercise module to the time he was placed in a holding cell in the housing unit and searched. A strip search of the inmates before their removal from the exercise modules necessarily protected staff and inmates for any unlawful activity during the course of the escort from the SMY to the housing unit. Thus, the search policy I enacted in August 2007, served a legitimate correctional interest.

The unclothed body search policy took effect on August 20, 2007, and it was incorporated into Operational Procedure No. 222 by way of addendum dated August 2007.

As part of the review and investigation process, the facility Captains, Associate Wardens, and I explored ways to address the inmates' privacy concerns with the unclothed body search policy and female staff complaints that inmates in the modules were exposing themselves while at the same time maintaining the safety and security of SHU staff and inmates during yard.  The consensus was to install mesh-type screens around the exercise modules. From late March to May 2008, the installation of the privacy screens on the 4B SMY began.  15.

I do not recall receiving, or being informed of, any complaints from inmate concerning the unclothed body search policy after the installation of the privacy screens.

(Adams Decl., ECF No. 43-3 ¶¶1, 5-9, 14-15.)

15

Defendants' documentary evidence, in part, consists of the following:

**Exhibit C** is a copy of the relevant sections of California State Prison-Corcoran's (COR) Operational Procedure No. 222, Security Housing Unit, dated October 2006.  Sections 102 E(8) and 504 F state:  "All inmates returning from the exercise yard will be escorted to the rotunda holding cell, where the escorting officers shall conduct an unclothed body search prior to returning the inmate to his assigned cell," and "Upon returning to their respective housing units (inclusive of yard recalls), all inmates will be placed in a rotunda holding cell and an unclothed body search shall be conducted.  Additionally, hand held metal detectors will be used on all inmates being returned to the housing unit."  (ECF No. 43-3, Exh. C.)

**Exhibit D** is a copy of the memorandum authored by Defendant Adams entitled, "Unclothed Body Searches in the Security Housing Unit (SHU), dated August 1, 2007, which states "Effective August 20, 2007, Inmates in the SHU shall undergo an unclothed body search prior to removal from their cell or the Small Management Yard (SMY).  This security measure will assist in ensuring inmates are free of all contraband prior to escort.  Your cooperation in this matter is greatly appreciated.  (ECF No. 43-3, Exh. D.)

**Exhibit E** is a copy of the August 2007 Addendum to COR Operational Procedure No. 222, which states "Inmates must submit to an unclothed body search prior to being restrained and escorted from their cell.  Inmates must submit to an unclothed body search prior to being restrained and escorted from the Small Management Yard (SMY).  This information will be included in the next revision of this operational procedure."  (ECF No. 43-3, Exh. E.)

**Exhibit F** is a copy of the relevant sections of COR's Operational Procedure No. 222, dated October 2007.  Sections 102 E(8),504 F, and 605 A state:  "All inmates returning from the exercise yard will subject to an unclothed body search prior to returning the inmate to his assigned cell;" "Upon returning to their respective housing units (inclusive of yard recalls), all inmates will be subject to an unclothed body search.  Additionally, hand held metal detectors will be used on all inmates being returned to the housing unit;" and "Inmates must submit to an unclothed body search prior to being restrained and escorted from the Small Management Yard (SMY)."  (ECF No. 43-3, Exh. F.).

**Exhibit G** is a true and correct copy of the April 2008 Addendum to COR Operational Procedure No. 222, which states "Inmates must submit to an unclothed body search prior to being restrained and escorted from their cell.  Inmates must submit to an unclothed body search prior to being restrained and escorted from the Small Management Yard (SMY).  This information will be included in the next revision of this operational procedure."  (ECF No. 43-3, Exh. G.)

**Exhibit H** is a true and correct copy of the relevant sections of COR's Operational Procedure No. 222, dated October 2008.  Sections 102 E(8), 504 F, and 605 A state:  "All inmates returning from the exercise yard will subject to an unclothed body search prior to returning the inmate to his assigned cell;" "Upon returning to their respective housing units (inclusive of yard recalls), all inmates will be subject to an unclothed body search.  Additionally, hand held metal detectors will be used on all inmates being returned to the housing unit;" and "Inmates must submit to an unclothed body search prior to being restrained and escorted from the Small Management Yard (SMY)."  (ECF No. 43-3, Exh. H.)

**Exhibit M** consists of copies of Demand Maintenance Work Orders Nos. 181825 and 181827, which are work orders issued on April 9, 2008 for the installation of privacy screens on 4B Small Management Yard at CSP Corcoran, showing that the work was completed . (ECF No. 43-3, Exh. M.)

The court finds that defendant Adams has met his initial burden on summary judgment, to come forward with evidence that establishes a lack of existence of a triable issue of fact as to whether his August 2007 strip search policy was reasonable under the Fourth Amendment. The burden therefore shifts to Plaintiff to come forward with evidence that the policy was unreasonable.

### 3.    Plaintiff's Opposition

Plaintiff argues that the unclothed body searches pursuant to defendant Adams' August 2007 policy were indecent and unreasonable, and the change in policy, from conducting strip searches inside the building to conducting them outdoors, was not justified. Plaintiff offers as evidence the allegations in his verified First Amended Complaint, and his Declaration in support of his opposition.

Plaintiff alleges in the FAC:

The Department Operations Manual (D.O.M.) Sec. 52050.18.3 describes an unclothed body inspection (strip search) as follows:

"The inmate shall then completely disrobe, staff shall inspect and search each item of clothing and visually inspect the inmates body. The inmate shall face the staff member who shall inspect hair, ears, mouth, nose, body, armpits, hands, scrotum, genitals, and legs. The inmate shall turn away from staff upon inspection and staff shall inspect the inmates back buttocks, thighs, toes, bottom of the feet and lastly the anal area by having the inmate bend over, spread the cheeks of their buttocks and cough."

The California Code of Regulations, title (15), (C.C.R. Tit. 15) Sec. 3287(b) specifically mandates that unclothed body inspections shall be conducted in a professional manner which avoids embarrassment of indignity to the inmate and whenever possible shall be conducted outside the view of others. (See Exhibit "C")

The D.O.M 52050.18.3 specifically requires that defendants conduct unclothed body searches in an area that allows the inmate to preserve some measure of dignity and self respect. (See Exhibit "E")

Corcoran's Prison Operations Procedure Manual (O.P.) 222 501, E.1.b, requires that unclothed body inspections be conducted in a holding cell which affords some measure of privacy. (See Exhibit "D")

17

Prior to the events in question and discussed herein, unclothed body inspections (i.e., strip searches) were conducted as policy requires in the 4B-3R unit holding rotunda cells prior to going to the exercise yard outdoors and returning from yard.  In the month of February 2008, C.S.P. Corcoran staff suddenly began conducting unclothed body inspections outside on the yard per a memorandum authored by defendant Adams, (C.S.P. Corcoran) (See Exhibit "F").  As a result of this unlawful order, Plaintiff was forced to strip completely naked in a filthy yard cage (i.e., Small Management Yard) filled with insects, bird feces, and in plain view of a yard of inmates including staff of the opposite sex.  This filthy environment is magnified during the winter months, when temperatures are regularly in the mid to low 30 degrees.  Overnight lows, rain, wind, are the norm and Plaintiff is forced to strip naked outdoors under all of these conditions, in puddles of water, etc., with no exceptions.  This practice of outdoor public "strip searches" directly violates prison policy and administrative regulations governing unclothed body searches.  (See D.O.M. 52050.18.3; C.C.R. tit 15 3287(b); O.P. 222 501.E.I.b.)

Due to the continuous embarrassing and degrading nature of the public strip searches and unsanitary conditions Plaintiff was forced to endure, he participated in a "Group" 602 grievance appeal which was filed on behalf of John Martinez. # (J-52893)  On March 12, 2008, Chief Deputy (Junious) responded to the 602 grievance and Mr. Martinez' written complaint of February 27, 2008.  Mr. Junious informed Mr. Martinez and inmate representatives that female staff would not be present during strip searches and that privacy screens would be installed to obscure the view from the facility program office.

(First Amended Complaint (FAC), ECF No. 11 at 6-8 ¶¶9-17.)

Plaintiff testified as follows:

The manner of the search.  The unclothed body searches conducted in the exercise modules consisted of an inmate removing all his clothing in the presence of other inmates, staff, and any given time, officers of the opposite sex.  The searches in practice were dehumanizing to Plaintiff because he had to stand there naked on a bare filthy concrete in his bare feet before being ordered to show the top and bottom of each hand, run his hands over his hear, flip each ear forward, run a finger around the inside of his mouth, lifting his genitals, then turning and lifting each food before bending at the waist, spreading his buttocks with his hands, then squatting and coughing, (Dept. Operations Manual (DOM) § 52050.18.3) all done outdoors in plain view of anyone in the vicinity.  This practice was to be done daily in routine practice done in non-emergency situations and defendant Adams placed nothing in the written policy prohibiting it.  (Pl. Exhibit "F")

(Pltf's Decl., Doc. 57 at 9 ¶A.)

The justification of the search.  Defendants routinely conducted the unclothed body searches inside of the building in (2) available cells that afforded more privacy and did not hinder staff from their searches.  These searches were done in an area known as the "rotunda."  Indeed, on the date of this incident, Plaintiff observed the first yard shift of inmates searched one by one in these rotunda cells located inside the building, all without incident or the use of force.  It just so happened that staff for the second yard shift wanted to conduct unclothed body searches in plain view of other inmates in the exercise modules.

(Id. at 10 ¶B.)

The location of the search. The unclothed body searches are conducted in the outdoor SMY's, which are essentially large cages. Each building has its own set of 26 cages (2 rows of 13) which are right next to each other and are in the middle of 2 roadways on the facility and utilized by maintenance, counselors, nurses, visitors, etc. The strip searches are visible to all the inmates in the vicinity and also to all staff conducting yard recall, medical escorts, and any one else using roadway. The defendants' motion for summary judgment mentions "privacy screens" (Def. MSY p. 12 ¶8, 9) providing privacy but failed to mention that at the time of this incident (March 15-16, 2008), those privacy screens were not present and in fact, those privacy screens built after this incident were actually a response to the need of privacy. In fact, the creation of the "privacy screens" following this incident should allow this court to see a genuine dispute of material fact(s) in regards to clear violations of Plaintiff's Constitutional rights. CDCR's own regulations mandate that unclothed body searches be conducted in an area that allows the inmate "to preserve some measure of dignity and self respect." (D.O.M. 52050.18.3); Title 15 § 3287(b) states that unclothed body inspections shall be conducted in a professional manner which avoids embarrassment or indignity" to the inmate and wherever possible shall be conducted outside the view of others." CSP-COR's O.P. 222 updated on Oct. 2007 which governs the procedures utilized n CSP-COR SHU stated under Sec. 501(e), unclothed body searches of SHU inmates, sub-section (1)(b) "All unclothed body searches will be conducted within their assigned cell."

(Id. at 10-11 ¶C.)

## 4. **Discussion**

Plaintiff has not established that a triable issue of fact exists concerning the content and implementation of defendant Adams' new policy for inmate strip searches at CSP. While the parties disagree about the degree of unsanitary conditions in the outdoor cages, the determination of the reasonableness of the new search policy does not turn on whether the cages were "filthy" or "regularly cleaned by inmate workers." Therefore, the court finds no genuine issue of material fact.

As discussed above, the reasonableness of a particular search of an inmate is determined by reference to the prison context. Michenfelder, 860 F.2d at 333. Each case requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Bell, 441 U.S. at 558. The court shall now consider the *scope* of the searches, the *manner* in which they were, the *justification* for initiating the searches, the *place* in which they were conducted, and the cross-gender nature of the searches.

***Manner and Scope of Searches.*** The court finds no issue concerning the reasonableness of the manner and scope of the unclothed body searches themselves. There is

no disagreement that the searches proceeded substantially the same both before and after the August 2007 policy change.  (DUF No. 44; Gosselin Dep. 69:14-70:11.)  Plaintiff challenges the policy requiring the searches to take place outdoors in view of others, but he does not challenge the searches themselves.

*Justification for Searches.*  Defendant provides evidence showing that the location of the searches was changed to the SMY to advance the prison's interest and need to control the movement of contraband and reduce the risk of violence in the SHU.  The SMY was deemed a high risk area because it afforded inmates an opportunity to exchange or obtain weapons, drugs, or illegal information, (Adams Decl ¶6.), and the prior policy of searching inmates inside the housing unit did not prevent or reduce the movement of contraband within the SHU, (Id. ¶¶7, 8).  The SHU inmates were able to commit assaults, relay information or threats, or exchange weapons or other contraband during the escort to the housing unit from the SMY, and the new policy reduced the risk of these unlawful activities during the escort. (Id).

*Cross-gender Nature of Searches.*  Plaintiff acknowledges that he was never strip searched by female staff.  (Gosselin Dep. 27:14-25.)

Plaintiff's arguments that the outdoor searches were unreasonable because they were conducted publicly without reason, and conducted against prison rules, are unpersuasive.  The fact that a search is conducted against prison rules, without more, does not make it unreasonable under the Fourth Amendment.  See Paul v. Davis, 424 U.S. 693 (1976). Plaintiff's assertion that on one occasion he observed inmates being searched in rotunda cells inside the building without incident or the use of force is not sufficient to rebut Defendants' evidence that a new policy was needed because the old policy was not working.  (Pltf's Decl. at 10 ¶B.)  Plaintiff acknowledges that he was not aware of the need for a change in policy. (Plaintiff's Deposition of August 13, 2014 at 97:10-98:12.)

The court finds that defendant Adams' August 2007 change in policy for strip searches was justified to address the prison's interest and need to control the movement of contraband and reduce the risk of violence in the SHU, protecting the safety and security of prison officials, other inmates and visitors to the prison.

***Location of Searches.*** The court finds that the brevity of the unclothed body searches and the immediate need to protect staff and inmates from the movement of contraband (and violence that ensued) outweighed Plaintiff's limited rights to privacy when being strip searched outdoors where other inmates, prison staff, and visitors could see him.

Defendants cite <u>Florence v. Fd. Of Chosen Freeholders</u>, 132 S.Ct. 1510, 1518 (2012), in which the Supreme Court concluded that strip searches did not violate the Fourth Amendment, reasoning that the difficulty of operating a detention center and the need for officials to control contraband to reduce the violence towards inmates and staff that naturally flowed from the presence of contraband in institutions where resources are scarce and inmates struggle to gain power necessitated the strip search policy.[5] However, <u>Florence</u> did not address outdoor strip searches or strip searches observed by other inmates and prison staff, including female staff.

The court finds no evidence that prison staff walking by or using the roadway next to the outdoor cages where strip searches were conducted, or inmates in adjacent cages, did more than casually observe unclothed inmates from a distance during strip searches lasting a minute or less. Plaintiff has acknowledged that he was never strip searched by female staff, that the closest proximity he recalls female staff passing by him while undergoing a strip search on the SMY was about twenty feet, and that they did not gawk or say anything to him. (Gosselin Dep. 27:14-25; 102:10-104:6.) Measures were taken in 2008 to provide the inmates with more privacy, when the prison placed privacy screens around the exercise modules. Thus, the prison explored alternate means of providing inmates with more privacy for the SMY searches. Further, in 2009 the strip search policy was changed to allow inmates to keep their socks on and drop their boxers rather than removing them completely, and the requirement for them to spread their butt cheeks was removed.

In light of the seriousness of the immediate need to control the movement of contraband from the SMY, to protect prison staff, inmates, and visitors to the prison, the court finds that

---

[5] The strip searches in <u>Florence</u> were similar to the strip searches at CSP, involving a visual inspection of the detainee's naked body, including opening his mouth, lifting his tongue, holding out his arms, and lifting his genitals, and did not include any touching of unclothed areas by the inspecting officer. <u>Florence</u>, 132 S.Ct. at 1514-15.

the invasiveness of the inmates' personal rights that the searches entailed were outweighed by the prison's need for safety and security.  Therefore, the strip searches of Plaintiff pursuant to defendant Adams' August 2007 policy were not unreasonable under the Fourth Amendment

### Policy Discussion

The court finds that defendant Adams' August 2007 policy was related to legitimate penological interests, to reduce the movement of contraband from the SMY to the SHU, and to reduce the violence that resulted.  The prior location for the strip searches had been found ineffective in stopping the movement of contraband into the SHU.

While Plaintiff was temporarily forced to choose between his rights to exercise and his rights to privacy, in this case the violation of privacy was minimal and the prison resolved the issue by placing privacy screens around the modules.  The unclothed strip searches performed within view of others only lasted one minute, and the prison's interest in safety and security outweighed Plaintiff's temporary loss of privacy.  As discussed above, the Ninth Circuit "has found that assigned positions of female guards that require only infrequent and casual observation, or observation at a distance, and that are reasonably related to prison needs are not so degrading as to warrant court interference." Michenfelder, 860 F.2d at 334 (citing Grummett, 779 F.2d at 494-95).

Based on the foregoing, the court finds that defendant Adams' August 2007 policy for conducting strip searches did not violate Plaintiff's rights under the Fourth Amendment.

**B.**   **Excessive Force and Failure to Protect– Eighth Amendment**

**1.**   **Legal Standards**

**a.**   **Excessive Force Claims**

The Eighth Amendment prohibits those from operating our prisons from using "excessive physical force against inmates." Farmer v. Brennan, 511 U.S. 825 (1994); Hoptowit v. Ray, 682 F.2d 1237, 1246, 1250 (9th Cir. 1982) (prison officials have "a duty to take reasonable steps to protect inmates from physical abuse"); see also Vaughan v. Ricketts, 859 F.2d 736, 741 (9th Cir. 1988), cert. denied, 490 U.S. 1012 (1989).  "Being violently assaulted

///

1   in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against

2   society.'"  <u>Farmer</u>, 511 U.S. at 834.

3          Whenever prison officials are accused of using excessive physical force in violation of

4   the Eighth Amendment prohibition against cruel and unusual punishment, the core judicial

5   inquiry is whether the force was applied in a good faith effort to maintain or restore discipline,

6   or maliciously and sadistically to cause harm.  <u>Hudson v. McMillian</u>, 503 U.S. 1, 6-7 (1992).

7   Force does not amount to a constitutional violation if it is applied in a good faith effort to

8   restore discipline and not "maliciously and sadistically for the very purpose of causing harm."

9   <u>Whitley v. Albers</u>, 475 U.S. 312, 320-21 (1986); <u>Clement v. Gomez</u>, 298 F.3d 898, 903 (9th

10  Cir. 2002).  Under the Eighth Amendment, the court looks for malicious and sadistic force, not

11  merely objectively unreasonable force.  <u>Clement</u>, 298 F.3d at 903.

12         In determining whether the constitutional line has been crossed, the Court may consider

13  such factors as the need for the application of force, the relationship between the need and

14  amount of force that was used, the extent of injury inflicted, the threat reasonably perceived by

15  the responsible officials and any efforts made to temper the severity of a forceful response.

16  <u>Hudson</u>, 503 U.S. at 7.  Prison administrators should be accorded wide-ranging deference in the

17  adoption and execution of policies and practices that in their judgment are needed to preserve

18  internal order and discipline and to maintain institutional security.  <u>Whitley</u>, 475 U.S. at 322.

19              **b.**  <u>**Failure to Protect**</u>

20         To constitute cruel and unusual punishment in violation of the Eighth Amendment,

21  prison conditions must involve "the wanton and unnecessary infliction of pain."  <u>Rhodes v.</u>

22  <u>Chapman</u>, 452 U.S. 337, 347 (1981).  Although prison conditions may be restrictive and harsh,

23  prison officials must provide prisoners with food, clothing, shelter, sanitation, medical care,

24  and personal safety.  <u>Farmer v. Brennan</u>, 511 U.S. 825, 832-33, 114 S.Ct. 1970 (1994) (internal

25  citations and quotations omitted); <u>Toussaint v. McCarthy</u>, 801 F.2d 1080, 1107 (9th Cir. 1986);

26  <u>Hoptowit v. Ray</u>, 682 F.2d 1237, 1246 (9th Cir. 1982).  Where a prisoner alleges injuries

27  stemming from unsafe conditions of confinement, prison officials may be held liable only if

28  they acted with "deliberate indifference to a substantial risk of serious harm."  <u>Frost v. Agnos</u>,

152 F.3d 1124, 1128 (9th Cir. 1998).  Thus, a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of harm and disregards that risk by failing to take reasonable measures to abate it.  Farmer, 511 U.S. at 837-45.  An officer can be held liable for failing to intercede only if he had a "realistic opportunity" to intercede.  Cunningham v. Gates, 229 F.3d 1271, 1289 (9th Cir. 2000); Robins v. Meecham, 60 F.3d 1436, 1442 (9th Cir. 1995).

## 2.   **Defendants' Position**

Defendants argue that defendants LaTraille and Taber reasonably perceived Plaintiff as a threat, used reasonable force in a good faith effort to restore order, and only used the amount of force necessary to compel Plaintiff's compliance with a lawful order.  Defendants argue that Plaintiff's injuries do not evidence that they acted maliciously or sadistically for the purpose of harming him.

With respect to defendant Hubach, Defendants argue that he was not aware of a substantial risk of serious harm to Plaintiff, because he did not see defendants LaTraille and Taber use unreasonable or excessive force.

Defendants' evidence consists of Plaintiff's Deposition testimony, the Declarations of Hubach, Taber, LaTraille, and Esquivel, and supporting exhibits.

Testimony from Plaintiff's Deposition follows.

Q.     Around what time did the officers come to your exercise cage or module and inform you that you had to submit to a strip search before you were returned to your cell?  And this is now March 15th.

A.     Probably about 3:30, four o'clock.

Q.     Do you recall who the officers were that came to your exercise module?

A.     I think it was – can I look at my thing?  He worked in our building.

Q.     Sure.

A.     I can't remember his name right now, but it was a CO.  He was one of our floor staff.

(Plaintiff's Deposition of August 13, 2014 at 41:5-16, ECF No. 43-7 at 117.)

///

A.      That officer's name was Silva.  His name was Silva.

(Id. at 42:9-10, ECF No. 43-7 at 117.)

Q.      You're aware that you're required to follow the direct orders given to you by correctional officers?

A.      Am I aware of that?

Q.      Correct.

A.      Generally yes.

(Id. at 43:22-44:1, ECF No. 43-7 at 117.)

Q.      After Officer Silva do you recall who the next staff member was that came to your exercise module and spoke to you or gave you an order that afternoon of March 15th, 2008?

A.      I think it was a sergeant.  As far as an order, I think it was the sergeant that came.  A sergeant came.

Q.      What sergeant?  Which sergeant?

A.      I don't recall.

Q.      Do you recall what she or he looked like?

A.      I know it was a he.

Q.      What did he look like?

A.      It was a Hispanic male.  That's it.  That's all I – it was six years ago.  I don't remember exactly.  I wasn't really – he was telling me to do something I wasn't going to do, so I don't remember his specific name.  I don't remember his specific name.

Q.      Okay.  When the Hispanic sergeant came to your exercise module, did he come by himself or was there someone else with him?

A.      There was a nurse with him.

Q.      Had you seen that nurse before?

A.      No.

Q.      Was it a male or female nurse?

A.      I believe it was a female.

Q.      Other than being female, do you recall any other characteristic about her?

A.      No.

25

Q.    And what did the Hispanic sergeant say to you?

A.    "You need to cuff up.  You need to strip out," and I believe he also asked us if we had asthma or some kind of medical question.  I'm not a hundred percent as far as the exact question.  I think they asked us if we had asthma or something.

Q.    Do you recall how long after Officer Silva came to your exercise module that the sergeant and the nurse came to the module?

A.    No, not exactly.  No.  Hours, though, like two hours, maybe three hours.

Q.    Was it still daylight outside?

A.    I think it was starting to get dark.

Q.    When the sergeant ordered you to submit to the strip search, what did you tell him?

A.    I told him that I was willing to cuff up and I was willing to be strip-searched but in the rotunda.

Q.    What did he say in response to that?

A.    He said, "No. Strip out.  Strip out right here."

Q.    What was your response?

A.    The same.  I just repeated the same.  In my opinion, I didn't understand why he wouldn't just cuff me up and take me out.

(Id. at 48:4-50:4, ECF No. 43-7 at 118-119.)

Q.    When did someone come to your exercise module and speak to you after the sergeant and the nurse left your exercise module?

A.    Approximately nine o'clock, ten o'clock, somewhere around there.  I didn't have a watch.

Q.    Who was that that came to your exercise module?

A.    LaTraille and Hubach.

(Id. at 53:13-19, ECF No. 43-7 at 120.)

A.    I believe I spoke to Hubach.

Q.    Okay, what did you say to Hubach.?

A.    "Can we get some kind of lunches or something for us to eat?

Q.    And what did he say in response to that?

A.    "Cuff up."  I mean "Strip out."

Q.    What did you say in response to that?

26

A.   "I'm willing to strip out.  Just take me into the rotunda and you can strip me out.  You can take me in the shower.  They used to take us in the showers sometimes if the rotundas were full.  They would take us to the shower and strip us out and take us back.  I would be willing to do that.  I wasn't refusing to strip out.  I was only refusing to strip out where it was freezing.

Q.   Did you – what did he say in response to your statement that you're willing to strip out but only inside the housing unit?

A.   He said, "No.  No.  Strip out right here."

Q.   And what did you say in response when he denied your request?

A.   I think I just walked away.  I just walked away.  Basically, the general consensus was we're not going to get nothing.  That's what I gathered out of that situation, we're not going to get nothing.  So I just walked away.

Q.   Did he say you were not going to get nothing?

A.   Yes.  He said, "You guys are not going to get anything unless you strip out."

(Id. at 55:13-56:16, ECF No. 43-7 at 120.)

Q.   Isn't it fair, based on your recollection, that you did not agree to submit to the required strip search until almost 20 minutes later from the time that they started?

A.   Yeah.  That's a lot of pepper spray, 20 minutes.

Q.   But they didn't pepper-spray you 20 minutes continuously, did they?

A.   Not continuously, but they kept coming back with more canisters.

Q.   The first time that they stopped pepper-spraying you, did you tell either LaTraille or Taber that you would be willing to submit to the required search?

A.   I didn't say anything.  I didn't say anything and I – the last thing I want to do is talk and breathe that stuff in.  No, I didn't say anything.

Q.   Did you signal to them to inform them that you would be willing to submit to the required search after they stopped pepper-spraying the first time?

A.   No, because at that point I wasn't willing to.

Q.   Okay.  Then the video shows that they came back several minutes later, pepper-sprayed you and your cellmate for whatever minutes or seconds.  That's on the video.  I'm not going to even try to guess what's on the video.  It speaks for itself.  After they stopped the second time, did you tell either Taber or LaTraille that you would be willing to submit to the required search?

27

A.   At some point I did, yes.

Q.   Was it the second time?

A.   I don't know what time it was, but it was – it was the last time.

Q.   Okay.  When you finally told Taber or LaTraille that you would be willing to submit to the required search, at any time did either one of them continue pepper-spraying you after you informed them that you would be willing to submit to the search?

A.   No.

(Id. at 68:6-69:19, ECF No. 43-7 at 122-23.)

Q.   Describe for me how long the burning sensation lasted on your skin from the time you were placed – or returned to your cell in the earlier hours of March 16th, 2008.

A.   It lasted about an hour.  Once you let it die, unless you remove it from your body, every time you rewet yourself, you just reactivate it.  Because it is oil based, it sticks to you.  Unless you use soap and actually remove the oil from your body, it's just going to be there.  That burning feeling will go away, but as soon as you get it wet again, you're on fire all over again.  It just wakes it right back up.

Q.   So my question is how long did you feel a burning sensation?  Did it – did you burn the entire time from the time you were returned to your cell to two or three days later when you were given a shower?  Was it only when you splashed water on yourself that you reactivated? I need you to tell me in your own words what you were feeling.

A.   At least for one whole day, we were just on fire.  It doesn't go away unless you take it off, and we had no means to take it off.

(Id. at 92:11-93:7, ECF No. 43-7 at 126-27.)

Q.   If you were – other than feeling burning, were you feeling faint, weak or having any other kind of reaction to the pepper spray?

A.   Just burning.

Q.   Did you request medical care from any of the staff, whether it be medical or custodial, on March 16th, 2008?

A.   I had just asked the lieutenant, their supervisor, for a shower and he didn't give me one.  So no, I didn't.

(Id. at 94:9-18, ECF No. 43-7 at 127.)

Defendant Hubach testified as follows:

Most SHU inmates are provided yard time by being placed in exercise modules on the small management yards (SMY) on Facility 4B.

28

At approximately 3:20 p.m. on the afternoon of March 15, 2008, I was informed that 75 inmates were refusing to submit to the unclothed body search in the exercise module in protest of the August 2007 change to the search policy. I ordered staff on the yard to counsel as many inmates as they could and obtain the inmates' compliance with lawful orders to submit to the required search.

By late evening, the AOD (Administrative Officer of the Day) ordered that two tactical teams be assembled and procedures begin for the calculated use of force to extract inmates from the modules. The AOD also approved the use of Oleoresin Capsicum (also referred to as "pepper spray") to compel the inmates' compliance with orders.

The pre-extraction procedures included obtaining medical clearances for the use of pepper spray and providing the inmates with the required admonishments and warnings that force was going to be used if they continued to refuse to comply with lawful orders.

(Hubach Decl. ¶¶4, 8, 10-11.)

During the extractions on March 15 to 16, 2008, I did not see LaTraille or Taber use any more force than was necessary to compel an inmate's compliance with lawful orders to submit to an unclothed body search. The Sergeants used pepper spray until the inmate agreed to submit to the required search. I never saw them continue to spray an inmate after the inmate agreed to submit to the required search. Their use of pepper spray was applied in good faith and for no other purpose than to compel the inmate's compliance with staff's orders. The use of pepper spray was also the safest form of force and the least amount of force that could be used to compel compliance.

At approximately 2:57 a.m. on March 16, 2008, I approached the exercise module occupied by inmates Gosselin (E-80407) and Lerma and ordered them to submit to an unclothed body search before they could be removed from the module. Both inmates refused to comply with my order. I proceeded to inform them that physical force or chemical agents would be used to gain their compliance, and if force was used, they would be placed on property restriction. When Gosselin and Lerma again refused to comply with my order, I instructed LaTraille and Taber to use minimal force to compel their compliance.

(Id. ¶¶20-21.)

Defendant LaTraille testified as follows:

At approximately 2:57 a.m. on March 16, 2008, the team approached the module where inmates Gosselin (E-80407) and Lerma were located.

I heard Hubach order Gosselin and Lerma to submit to an unclothed body search before being removed from the module. Both inmates refused to comply with Hubach's order.

Hubach ordered Taber and me to use minimal force to compel Gosselin's and Lerma's compliance with his (Hubach's) lawful order.

Taber and I used multiple bursts of pepper spray from an MK-9 and MK-46 on Gosselin and Lerma. The bursts of pepper spray were usually one to two seconds long, but on a few occasions, the bursts lasted longer.

(LaTraille Decl. ¶¶6-9.)

 On at least four occasions, Taber and I stopped spraying to give Gosselin an opportunity to comply with Hubach's orders, retrieve more pepper spray, or allow the pepper spray to work.

 As soon as Gosselin and Lerma indicated their willingness to comply with Hubach's order to submit to the required unclothed body search, Taber and I stopped using pepper spray.

 In total, Taber and I dispersed pepper spray intermittently into Gosselin's exercise module for about five to six minutes although his entire extraction (from the time of Hubach's admonishment to Gosselin's medical evaluation) lasted approximately twenty-four minutes. I do not know how many cans of pepper spray we used for Gosselin's and Lerma's extraction or whether each can was full when we used it.

(Id. ¶¶11-13.)

 I did not use, and I did not see Taber use, any more pepper spray than was necessary to compel Gosselin's compliance with a lawful order to submit to an unclothed body search before exiting the exercise module as required by prison regulations.

 I did not use pepper spray maliciously, excessively, or unnecessarily for the purpose of causing Gosselin harm.

 Based on my training and experience, the use of pepper spray to compel Gosselin's compliance with Hubach's order was reasonable.  Using physical force to remove Gosselin, or any other inmate, from the exercise modules exposed the inmate and staff to physical injury or substantial harm.  During an extraction involving the use of physical force, staff enters a cell (or exercise module) and physically subdue and restrain an inmate.  An inmate will usually become combative and strike or lash out at staff in an attempt to avoid being restrained.  The inmate is also susceptible to sustaining substantial injuries if he is combative, and staff may use calculated strikes or batons to subdue him.  Also, an inmate who refuses to be searched before staff enters an enclosed area may have a weapon, which he can use to stab or slash staff.  This creates another risk for staff when using physical force to extract an inmate.

(Id. ¶¶19-21.)

Defendant Taber testified as follows:

 From approximately 10:40 p.m. on March 15, 2008, to 6:30 a.m. on March 16, 2008, I was involved in about 23 tactical extractions of inmates on Facility 4B.

 At approximately 2:57 a.m. on March 16, 2008, our team approached the module where inmates Gosselin (E-80407) and Lerma were located.

 I heard Hubach order Gosselin and Lerma to submit to an unclothed body search before being removed from the module.  Both inmates refused to comply with Hubach's order.

Hubach ordered LaTraille and me to use minimal force to compel Gosselin's and Lerma's compliance with his (Hubach's) lawful order.

LaTraille and I used multiple bursts of pepper spray from an MK-9 and MK-46 on Gosselin and Lerma.  The bursts of pepper spray were usually one to two seconds long, but on a few occasions, the bursts lasted longer.

My customary practice when using pepper spray was to aim for an inmate's facial or upper torso area because of its effectiveness.  However, Gosselin and Lerma covered their heads with their shirts and repeatedly bent over or turned their backs towards me such that I could not get a clear aim of their facial or upper torso areas, so I aimed for their bodies generally.  Due to the inmates moving around and turning their back towards me, the pepper spray landed on their arms, legs, sides, and back.  I did not purposefully aim for Gosselin's, or anyone's, buttocks or groin.

On at least four occasions, LaTraille and I stopped spraying to give Gosselin an opportunity to comply with Hubach's orders, retrieve more pepper spray, or allow the pepper spray to work.

As soon as Gosselin and Lerma indicated their willingness to comply with Hubach's order to submit to the required unclothed body search, LaTraille and I stopped using pepper spray.

In total, LaTraille and I dispersed pepper spray intermittently into Gosselin's exercise module for about five to six minutes although his entire extraction (from the time of Hubach's admonishment to Gosselin's medical evaluation) lasted approximately twenty-four minutes.  I do not know how many cans of pepper spray we used for Gosselin's and Lerma's extraction or whether each can was full when we used it.

(Taber Decl. ¶¶6-14.)

Defendants submitted video evidence showing the extraction of Plaintiff and his cell mate ("inmates") from the exercise module.   The court has viewed the video and summarizes as follows.

The video, taken at night, lasts approximately 24 minutes.  The outdoor exercise module appears as a large screened cage, and two inmates in tee shirts, shorts, and shoes are visible standing inside.  Two prison officials, one male and one female, introduce themselves on camera.   The male official then approaches the module, speaks to the inmates in the module, and departs from view.  Two officers wearing helmets and gear approach the module and apply several short bursts of pepper spray through the sides of the module directly at the two inmates.  The officers depart from view, return about 6 minutes later, and apply approximately 20 more short bursts of pepper spray.  The inmates continue standing in the module, with their backs turned away from the pepper spray most of the time.  The officers depart from view and return about 3 minutes later, again apply pepper spray in several bursts, some longer than 2 seconds.  The officers talk to the inmates, then apply more pepper spray, then depart for approximately 2 minutes.  The two officers return and apply more than 20 bursts of pepper spray, some of them long bursts.  Now it appears that the inmates are cooperating, and 3 more officers arrive.  The inmates are handcuffed through a port on the module and [not visible on the video] apparently submit to unclothed

strip searches, then are escorted to an outdoor area to hose off with water. Plaintiff's cellmate's head and back are hosed off, Plaintiff's head is hosed off, and the two inmates are escorted to a building by officers.  They stop at the doorway of the building, where the female official (nurse?) briefly looks the inmates over and makes notes on a clipboard before they enter through the doorway.

*Discussion*

The court finds that Defendants have met their burden to establish an absence of any triable issue of fact as to whether defendants LaTraille and Taber used excessive force against Plaintiff, and whether defendant Hubach failed to protect Plaintiff.  Defendants' evidence establishes that defendants LaTraille and Taber used force in a good faith effort to restore discipline and maintain order.  Specifically, Defendants' evidence establishes that defendant Hubach ordered Plaintiff to submit to an unclothed body search before leaving the exercise yard, and when Plaintiff refused, ordered defendants LaTraille and Taber to apply pepper spray to Plaintiff until he complied.  Defendants LaTraille and Taber declared that they did not use any other force on Plaintiff to force him to comply with the order, and did not use force on Plaintiff for any purpose other than to compel him to comply with an order.

Defendants have also met their burden with respect to whether defendant Hubach failed to protect Plaintiff from excessive force.  Defendants' evidence establishes that defendant Hubach did not know about and disregard a substantial risk of serious bodily harm to Plaintiff. Specifically, defendant Hubach declares that he did not know about a substantial risk because he did not observe the use of excessive force against Plaintiff by defendants LaTraille and Taber.

The burden now shifts to Plaintiff to come forward with evidence of a triable issue of fact – evidence that defendants LaTraille and Taber used force on Plaintiff sadistically and maliciously for the purpose of causing harm, and evidence that defendant Hubach knew of and consciously disregarded a substantial risk of serious harm to Plaintiff.

### 3.   <u>Plaintiff's Position</u>

Plaintiff argues that defendants LaTraille and Taber sprayed him excessively with pepper spray, and defendant Hubach failed to intervene to protect Plaintiff from a substantial

risk of serious harm. Plaintiff's evidence consists of the allegations in his verified First Amended Complaint and Plaintiff's Declaration.

In the First Amended Complaint, Plaintiff alleges as follows with respect to his excessive force claim:

> At approximately 4:30 am, ... defendant Hubach ordered .. the use of excessive force against me, for the sole purpose of forcing me to [submit to] a degrading public strip search.

> Seconds after defendant Hubach's order, defendant LaTraille and defendant Taber commenced a vicious and relentless attack on Plaintiff and his cellmate with the use of pepper spray. A total of approximately 9 canisters [of pepper spray] were implemented against me. They initially sprayed me with approximately 6 cans of pepper spray until Plaintiff was completely drenched in pepper spray. I then heard defendant Hubach say, "Let them soak for awhile." Defendants Hubach, LaTraille, and Taber then proceeded to extract the next SMY yard and at the completion of their extraction returned to the SMY cage where Plaintiff was still soaking in pepper spray. At this time, defendants LaTraille and Taber sprayed Plaintiff with approximately 3 additional cans of pepper spray.

> Plaintiff's entire body, face, back, legs, genitals and anus were completely saturated with multiple canisters of toxic chemicals. The sudden and drastic change of temperature on my body from cold to burning was brutal. My body was completely on fire! When Plaintiff could no longer tolerate the burning, he submitted to the degrading practice defendants desired.

(First Amended Complaint, Doc. 11 at 11-12, ¶¶23, 24.)

Plaintiff testified as follows, in part:

> I observed Hubach order LaTraille and Taber to commence a relentless attack of pepper spray against my cellmate and I. I observed LaTraille and Taber use approximately 9 canisters of pepper spray that ranged from the small MK-9 canisters to the larger MK-46 and MK-505, which was the bigger canister the size of a fire extinguisher used on both of us. (See Defts' Exhibit "J" Extraction Video.)

> At first, the bursts were about 2 seconds long, however after a few occasions, the bursts were a lot longer and approximately 40 seconds or longer.

> The bursts of pepper spray were aimed at my upper torso, arms, legs, side, back, and genitals. I felt a stinging, burning sensation until my entire body felt like it was on fire.

> The bursts of spray lasted about 5 to 10 minutes.

> I, nor my cellmate were being violent, disrespectful, or threatening to anyone.

> I wanted decency and some privacy before stripping out, and not be exposed to the elements nor officers of the opposite sex.

The excessive use of pepper spray against me caused me to be with a lot of discomfort in my eyes, nose, throat, and genitals which caused a severe burning and stinging sensation over my entire body for several days.

After what seemed like an eternity, my cellmate and I submitted to an unclothed body search and [I was] given my same drenched in pepper spray boxers to wear.

(Pltf's Decl., Doc. 57 at 20-21 ¶¶6-13.)

### Discussion

As noted above, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Matsushita, 475 U.S. at 587. However, Plaintiff's version of the facts is not supported by the video evidence submitted by Defendants. Citing the video, Plaintiff testified that he observed defendant Hubach order defendants LaTraille and Taber to commence a relentless attack of pepper spray against Plaintiff and his cellmate, and observed LaTraille and Taber use approximately 9 canisters of pepper spray, with some bursts lasting 40 seconds or longer.

A jury viewing the video evidence would find that it does not support Plaintiff's version of the events. First, Plaintiff is seen on the video turning his back to defendants LaTraille and Taber and covering his face with his T-shirt while they were spraying him with pepper spray. In the video, Plaintiff is not seen observing defendants LaTraille and Taber well enough while they were spraying him to have counted how many canisters of pepper spray they used. Further, the amount of pepper spray used, as shown on the video, was not enough to fill 9 canisters of the size that defendants can be seen using on the video, with pepper spray. If defendants used 9 canisters, they could not have been full canisters. Further, the video shows no bursts of pepper spray of "approximately 40 seconds or longer." Also, there is no evidence on the video that defendant Hubach ordered a relentless attack on the inmates, and defendants LaTraille and Taber's attack of pepper spray, as observed on the video, was not relentless. Defendants stopped spraying and backed away from the exercise module three times in the video, giving Plaintiff and his cellmate an opportunity to indicate they would submit to the strip search. As soon as it appeared on the video that the inmates were cooperating, the defendants

34

ceased using pepper spray.  Thus, based on the video evidence, it is not reasonable to infer that Plaintiff's version of the facts is accurate.

The court finds no evidence of a triable issue of fact whether the force that was used on Plaintiff was other than in good faith and an effort to maintain discipline, nor for the purpose or causing harm.  As to defendants LaTraille and Taber, the court finds that they have met their burden on summary judgment.  Plaintiff testified that after being pepper sprayed he felt a stinging and a burning sensation until his entire body felt like it was on fire, and he suffered a lot of discomfort in his eyes, nose, throat, and genitals which caused a severe burning and stinging sensation over his entire body for several days.  But when asked in his deposition whether he requested medical or custodial care from any of the staff on March 16, 2008, Plaintiff said no, he merely asked the lieutenant for a shower and his request was denied. Plaintiff testified that he did not request medical care from any of the staff on March 16, 2008, which suggests that any injuries he suffered were minimal.  However, the relevant inquiry is not whether Plaintiff's injuries were *de minimis,* but whether the use of force was *de minimis*. See Wilkins v. Gaddy, 559 U.S. 34, 37 (2010) ("Injury and force … are only imperfectly correlated, and it is the latter that ultimately counts.")  This case therefore turns on whether the force was used in a good faith effort to restore order or maintain discipline.  The extent of Plaintiff's injury will be a factor in determining whether the force used by defendants LaTraille and Taber was excessive.

There is ample evidence that the use of pepper spray was necessary to compel the inmates to comply with orders to submit to the strip searches, because less-forceful methods were tried without success, and serious security concerns existed.  Defendants LaTraille and Taber both testified that they heard defendant Hubach order Plaintiff and his cellmate to submit to an unclothed body search before being removed from the module, and both inmates refused to comply with Hubach's order.

Defendant Hubach testified that he was later informed that 75 inmates were refusing to submit to the unclothed body search in the exercise module, in protest of the August 2007 change to the search policy.  Hubach first ordered staff on the yard to counsel as many inmates

as they could to obtain the inmates' compliance with the orders, and some of the inmates cooperated.  When Plaintiff and his cellmate refused to comply, Hubach proceeded to inform them that physical force or chemical agents would be used to gain their compliance, and if force was used, they would be placed on property restriction.  When they again refused to comply with his order, Hubach instructed LaTraille and Taber to use minimal force to compel their compliance.  Evidence shows that security concerns existed when the officers approached the modules.  Dozens of inmates in an area deemed high-risk had refused to comply with orders.  Defendant Adams testified that the exercise modules (SMY), where Plaintiff and his cellmate were located on March 18-19, 2008, were deemed high-risk areas because movement to and from the exercise modules and yard provided inmates with the opportunity to commit assaults, relay information or threats, plan illegal activities, and exchange or obtain weapons or contraband.  Defendant Adams also testified that if an inmate was not strip searched before he was removed from the exercise module, he could stab an officer or another inmate, disseminate illegal information, or pass drugs or other contraband at any point in the time from when an inmate was removed from the exercise module to the time he was placed in a holding cell in the housing unit and searched.  Defendant Adams also testified that the strip search policy was changed because the yards were experiencing incidents of violence against staff and inmates and contraband, including inmate manufactured weapons, were being discovered during cell searches.  Thus, security concerns existed when Plaintiff and other inmates refused to submit to strip searches before leaving the exercise modules.

Evidence shows that the officers made efforts to avoid using pepper spray, and then to temper the severity of the pepper spray assault.  Lieutenant Hubach testified that he ordered staff to first counsel the inmates and persuade them to comply with the lawful orders to submit to the required search, and hours later he obtained permission to use pepper spray and medical clearance to extract the noncompliant inmates.  Hubach testified that he then followed the same procedure for each extraction, which included:  ordering the inmate to comply with the order to submit to the required search; informing the inmate that his failure to comply with the order would result in the use of force; and explaining that if force was used, the inmate would be

placed on property restriction; if the inmate refused to comply, Hubach ordered LaTraille and Taber to use minimal force to compel the inmate's compliance. Plaintiff testified that he knew he was required to follow the orders to submit to a strip search and that he repeatedly refused to comply when asked by defendant Hubach.

Defendants LaTraille and Taber both testified that they did not use any more pepper spray than was necessary to compel Plaintiff's compliance with the order. A jury viewing the video of the extraction provided by Defendants would see that mostly short bursts of spray were used and that the officers took breaks from spraying Plaintiff, allowing him the opportunity to indicate he was willing to cooperate. The video also showed that as soon as Plaintiff appeared ready to cooperate, the officers ceased using pepper spray and escorted Plaintiff and his cellmate to be decontaminated with water. Plaintiff testified that he was drenched with pepper spray and felt a burning sensation that lasted about an hour, although the burning continued throughout the day whenever Plaintiff applied water to his skin, which re-activated the chemicals. Plaintiff testified that when he was returned to his cell, his eyes burned, he could not see, his breathing was erratic, his heart was pounding, and his body was twitching uncontrollably from the chemicals. However, Plaintiff did not require medical care or suffer lasting injury. Plaintiff did not request medical or custodial care except to ask for a shower, which was denied. Based on this evidence, the court finds that the use of pepper spray was a good faith attempt to restore discipline and not a malicious and sadistic act to cause harm. Thus, defendants LaTraille and Taber's motion for summary judgment on Plaintiff's excessive force claims against them shall be granted.

With respect to Plaintiff's claim that defendant Hubach failed to protect him from excessive force, defendant Hubach testified that he did not see defendants LaTraille and Taber use excessive force on Plaintiff. In light of the court's finding that defendants LaTraille and Taber did not use excessive force, there was no excessive force for defendant Hubach to know about and protect Plaintiff from. Therefore, Defendants' motion for summary judgment on Plaintiff's claim against defendant Hubach for failure to protect him from excessive force should be granted in favor of defendant Hubach.

C.      **Adverse Conditions of Confinement – Eighth Amendment**

      1.      **Legal Standard**

"The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners not only from inhumane methods of punishment but also from inhumane conditions of confinement." Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006). "[W]hile conditions of confinement may be, and often are, restrictive and harsh, they 'must not involve the wanton and unnecessary infliction of pain.'" Id. (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)) . "What is necessary to show sufficient harm for purposes of the Cruel and Unusual Punishment Clause depends upon the claim at issue . . . ." Hudson v. McMillian, 503 U.S. 1, 8 (1992). "[E]xtreme deprivations are required to make out a[n] [Eighth Amendment] conditions- of-confinement claim." Id. at 9 (citation omitted). "Because routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." Id. (quotations and citations omitted). Prison officials may be held liable for violations under the Eighth Amendment only if they acted with "deliberate indifference to a substantial risk of serious harm." Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998).

The deliberate indifference standard involves an objective and a subjective prong.  First, the alleged deprivation must be, in objective terms, "sufficiently serious . . . ." Farmer v. Brennan, 511 U.S. 825, 834 (1994) (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)). Second, the prison official must "know[] of and disregard[] an excessive risk to inmate health or safety . . . ." Farmer, 511 U.S. at 837.  Thus, a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement if he knows that inmates face a substantial risk of harm and disregards that risk by failing to take reasonable measures to abate it. Id. at 837-45.  Prison officials may avoid liability by presenting evidence that they lacked knowledge of the risk, or by presenting evidence of a reasonable, albeit unsuccessful, response to the risk. Id. at 844-45.  Mere negligence on the part of the prison official is not

///

sufficient to establish liability, but rather, the official's conduct must have been wanton. Id. at 835; Frost, 152 F.3d at 1128.

Prison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety.  See Farmer, 511 U.S. at 832; Keenan v. Hall, 83 F.3d 1083, 1089 (9th Cir. 1996); Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000); Hoptowit v. Ray, 682 F.2d 1237, 1246 (9th Cir. 1982); Wright v. Rushen, 642 F.2d 1129, 1132-33 (9th Cir. 1981); Wolfish v. Levi, 573 F.2d 118, 125 (2nd Cir. 1978).   "Some conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets." (emphasis in original)  Wilson v. Seiter, 501 U.S. 294, 304, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).   Further, "[t]he denial of adequate clothing can inflict pain under the Eighth Amendment."  Walker v. Sumner, 14 F.3d 1415, 1421 (9th Cir. 1994) (citing Hoptowit, 682 F.2d at 1246) abrogated in part on other grounds by Sandin v. Connor, 515 U.S. 472 (1995).   Punishments "involv[ing] the unnecessary and wanton infliction of pain" are "repugnant to the Eighth  Amendment."  Estelle v. Gamble, 429 U.S. 97, 102-103 (1976) (internal quotation marks omitted).

## 2.   **Defendants' Arguments**

Defendants argue that Plaintiff's claim arising from the lack of food and adequate clothing fails because the conditions he faced were not sufficiently serious, and he did not tell any defendant that he required food or protection from the elements.  Defendants also argue that Plaintiff was adequately decontaminated before returning to his cell, and Defendants were unaware that he required additional decontamination.  As evidence, Defendants offer testimony from Plaintiff's Deposition, the Declarations of LaTraille, Hubach, and Taber, excerpts from the First Amended Complaint, and the video recording of Plaintiff's extraction.

In the First Amended Complaint, Plaintiff alleged a lack of food and clothing adequate for cold weather, during the time of his extraction from the exercise module.

Plaintiff was denied food and inclement weather clothing for the duration of this incident.  The weather on this night was windy and in the mid to low 30 degrees.  When Plaintiff originally came out to the yard, he was only wearing a thin pair of boxer shorts and T-shirt and had to endure 30 degree weather for 16 hours in this clothing.

(FAC, Doc. 11 ¶20.)

However, Defendants argue that there is no evidence in the video of Plaintiff's extraction that the temperatures were below freezing during the early hours of March 16, 2008. Defendants assert that the video does not show it was so cold that a person's breath could be seen when he spoke, does not show any wind to create a chill factor, and does not show that it had snowed.  (Video, Exh. I to Esquivel Decl., ECF No. 43-7.)

In his deposition, Plaintiff testified:

Q.      When did someone come to your exercise module and speak to you after the sergeant and the nurse left your exercise module?

A.      Approximately nine o'clock, ten o'clock, somewhere around there.  I didn't have a watch.

Q.      Who was that that came to your exercise module?

A.      LaTraille and Hubach.

(Plaintiff's Deposition of August 13, 2014, 53:13-19; ECF No. 43-7 at 120.)

Q.      What did – when LaTraille and Hubach came to your exercise module, did they speak to you?

A.      Yes.  We asked them for lunches.  We were asking them for lunches. We were asking them for clothing and kind of lunches or something.

Q.      You keep saying "we."  Who are you referring to when you say "we"?

A.      All the cages out there.  Maybe about two cages that way and two cages that way.  They were walking around, basically.  Maybe not speaking to everybody specifically but just walking, maybe talking to these three, and then walking a little more and talking to these three and so on.

Q.      Did you talk to LaTraille specifically?

A.      Yes.  We asked them for lunches.  He was standing right in front of me.

Q.      I'm asking about you, sir.

A.      Go ahead.

///

Q.   Let me finish my question.  Did you – did you – again, I don't want to talk about "we."  I want to talk about you.  Did you specifically talk to LaTraille?

A.   I believe I spoke to Hubach.

Q.   Okay.  What did you say to Hubach?

A.   "Can we get some kind of lunches or something for us to eat?"

Q.   And what did he say in response to that?

A.   "Cuff up."  I mean "Strip out."

Q.   What did you say in response to that?

A.   "I'm willing to strip out.  Just take me into the rotunda and you can strip me out.  You can take me in the shower."  They used to take us in the showers sometimes if the rotundas were full.  They would take us to the shower and strip us out and take us back.  I would be willing to do that.  I wasn't refusing to strip out.  I was only refusing to strip out where it was freezing.

Q.   Did you – what did he say in response to your statement that you're willing to strip out but only inside the housing unit?

A.   He said, "No. No. Strip out right here."

Q.   And what did you say in response when he denied your request?

A.   I think I just walked away.  I just walked away.  Basically, the general consensus was we're not going to get nothing.  That's what I gathered out of that situation, we're not going to get nothing.  So I just walked away.

Q.   Did he say you were not going to get nothing?

A.   Yes.  He said, "You guys are not going to get anything unless you strip out."

Q.   At any time that Hubach was in front of you, did you tell him you were feeling faint because you didn't have any food?

A.   No.

Q.   Did you tell him you had a medical condition that required you to eat, otherwise you could suffer some serious medical condition as a result of not eating?

A.   I didn't tell them that, but I was hungry.  I hadn't ate.

Q.   Did you tell him that you had some kind of medical condition and that you're not to be subjected to certain temperatures or climate?

A.   No.

41

Q. Did you tell him that?

A. But I was cold. It was 30 degrees, I was in boxers.

Q. Did you tell him?

A. Yes, I told him. We all told him. We were trying to get something, either blankets, something. By this time it's like nine or ten o'clock at night. I got boxers and a T-shirt and the temperature's going down.

Q. I don't want to talk about "we." I want to talk about you.

A. Okay. Me, I was cold.

Q. Did you –

A. Yes.

Q. Let me finish my question. Did you tell Hubach that you were cold?

A. Yes.

Q. Let me finish my question. Did you tell Hubach that you were starting to suffer adverse effects from the cold weather?

A. No. Not in those words, no, but I was cold.

Q. Other than telling him that you were cold, did you tell him anything else about the way you were feeling in terms of if you were feeling faint, if you were feeling sick, if you were feeling something other than cold?

A. No.

(Id. 54:16-58:5.)

Q. You're escorted to your cell?

A. Yes.

Q. And then you said – you testified earlier that you asked again about the shower. Tell me everything, to the best of your recollection, what was said between you and Hubach when you requested a shower the second time.

A. Basically, the same thing, "What's up with a shower? You guys going to give us showers? I had all the reason to believe –

Q. What did he say in response?

A. He didn't say anything. He closed the tray slot and left.

(Id. at 82:11-23; ECF No. 43-7 at 124.)

Q. Was the water in your sink running when you were returned to your cell on the early morning of March 16th, 2008?

A.    It was running, but I have a bad cell that barely any water comes out. Anyway I had no property, which means no cup or nothing to throw the water on myself or even plug up the sink.

Q.    Were your hands still handcuffed?

A.    No.  No, they weren't.

Q.    Did you make any effort to use the water from your sink to decontaminate yourself?

A.    Yes, I made an effort.

Q.    Do you recall if your cellmate made an effort to decontaminate himself using the sink in your cell?

A.    Yes.  We took turns.  There's one sink in there.

(Id. at 83:13-25-84:3; ECF No. 43-7 at 124.)

Q.    And you indicated that probably within an hour after being returned to your cell, you were given – well, an officer came to your cell to give you breakfast.  Did I understand you correctly?

A.    Yes.

Q.    So you were given food within an hour of being returned to your cell?

A.    Yes.  We hadn't eaten in 16 and a half hours and we didn't get a spoon to eat it with.

Q.    In your complaint you stated that you were given soap and a pair of boxers later in the day.  I can't remember your exact words.  It was later in the day of March 16th by another inmate?

A.    Three to four hours later.  I didn't have nothing in my cell, so I couldn't finish.  There was a bunch of traffic, officers walking around everywhere.  There was no opportunity to get anything.  It took at least three to four hours before everybody finally left and I was able to get something.  Basically, somebody else just gave us some boxers and some socks because the cops didn't give it to us.

Q.    Do you recall which inmate it was that gave you the boxers and soap?

A.    Yes, I do.

Q.    Who was that?

A.    My neighbor.

Q.    Who was that?

A.    The guy that lived next door.  I don't remember his name, but he was in Cell 8.

(Id. at 86:14-87:19; ECF No. 43-7 at 125.)

43

Q.      You indicated earlier that about three or four hours after you were placed in your cell, your neighbor gave you a pair of boxers and some soap. Did you use the soap?

A.      Yes.

Q.      And you used the water coming out of your sink to decontaminate yourself?

A.      Like I told you about ten minutes ago, the water didn't really come out of our sink. We had a bad sink. It was coming out, but we had put – I think we were putting our hands on there, running the water and trying to let it build up so we could have water to splash. The actual faucet thing, it was only coming out this much.

Q.      Since – I'm sorry. Let me just describe it for the record.

A.      About a quarter –

Q.      You put your –

A.      About a quarter inch.

Q.      Thank you. I was going to describe it. But you did use the soap and whatever water you could to decontaminate? Is that fair to say?

A.      I mean, if you want to call it that. We were splashing water on each other, basically, because one of us had to hold our hand on the bottom of the sink to let the water build up. Yeah, we did the best we could.

Q.      Describe for me how long the burning sensation lasted on your skin from the time you were placed – or returned to your cell in the early hours of March 16th, 2008.

A.      It lasted about an hour. Once you let it die, unless you remove it from your body, every time you rewet yourself, you just reactivate it. Because it is oil based, it sticks to you. Unless you use soap and actually remove the oil from your body, it's just going to be there. That burning feeling will go away, but as soon as you get it wet again, you're on fire all over again. It just wakes it right back up.

Q.      So my question is how long did you feel a burning sensation? Did it – did you burn the entire time from the time you were returned to your cell to two or three days later when you were given a shower? Was it only when you splashed water on yourself that you reactivated? I need you to tell me in your own words what you were feeling.

A.      At least for one whole day, we were just on fire. It doesn't go away unless you take it off, and we had no means to take it off.

(Id. at 92:11-93:7, ECF No. 43-7 at 126-127.)

Q.      If you were – other than feeling burning, were you feeling faint, weak or having any other kind of reaction to the pepper spray?

A.      Just burning.

Q.      Did you request medical care from any of the staff, whether it be medical or custodial, on March 16th, 2008?

A.      I had just asked the lieutenant, their supervisor, for a shower and he didn't give me one.  So no, I didn't.

(Id. at 94:9-18, ECF No. 43-7 at 127.)

Defendant Hubach declares as follows:

I do not recall following Gosselin's escort to his cell after he was medically cleared.  Nor do I recall him informing me that he wanted a shower after he was placed in his cell.  If he had, I would have inquired about his condition and any adverse effects he was experiencing.  Based on the information he provided, I would have summoned medical staff, had him escorted to medical, or provided him with additional decontamination by either having him escorted back to the decontamination area outside the building or providing him a shower.

Before Gosselin was extracted from the exercise module, I do not recall having any contact with him or his complaining to me that he required food, clothing, or that he was having an adverse effect to the climate or from the lack of food.  Had he so informed me, I would have ordered medical staff to evaluate him to determine if he was facing a substantial risk to his health by remaining in the exercise module, and I would have taken appropriate action based on the information medical staff provided.

(Hubach Decl., ECF No. 43-4 ¶¶25-26.)

Defendant LaTraille declares as follows:

Gosselin . . . alleged that I ignored his request for food and warm clothing on March 15 and 16, 2008.  I do not recall having any interaction with Gosselin before his extraction, nor do I recall him requesting food or clothing from me.  Had Gosselin, or any other inmate, complained to me that he required food or clothing or that he was having an adverse effect to the climate or from the lack of food, I would have ordered medical staff to evaluate him to determine if he was facing a substantial risk to his health by remaining in the exercise module, and I would have taken appropriate action based on the information medical staff provided.

(LaTraille Decl., ECF No. 43-5 ¶23.)

Defendant Taber declares as follows:

At approximately 2:57 a.m. on March 16, 2008, our team approached the module where inmates Gosselin (E-80407) and Lerma were located.

(Taber Decl., ECF No. 43-6 ¶7.)

The court finds that Defendants have met their burden to establish an absence of any triable issue of fact as to whether defendants Hubach, LaTraille and Taber were deliberately

45

indifferent to a substantial risk of serious harm to Plaintiff. Defendants' evidence establishes that the possible harm Plaintiff faced was not sufficiently serious and that none of the Defendants were aware that Plaintiff was suffering from cold, hunger, or effects from inadequate decontamination. Specifically, Defendants' evidence shows that Plaintiff was provided with breakfast after sixteen hours of fasting, that Plaintiff was provided opportunities to decontaminate, and that Defendants were not aware of a risk of serious harm to Plaintiff. Defendants also establish that Plaintiff's assertion that the weather was freezing cold on the night of Plaintiff's extraction is not supported by evidence on the video recording.

The burden now shifts to Plaintiff to come forward with evidence of a triable issue of fact – evidence that defendants LaTraille, Taber, and Hubach were deliberately indifferent to a substantial risk of serious harm to Plaintiff from the cold weather, lack of food, and inadequate decontamination.

### 3.    Plaintiff's Opposition

Plaintiff argues that Defendants knew that he was seriously suffering from cold, hunger, and inadequate decontamination, but they failed to reasonably respond. Plaintiff's evidence includes his allegations in the verified FAC, his Declaration, and Defendants' video recording of the extraction.

Plaintiff alleges in the FAC that:

> Plaintiff was denied food and inclement weather clothing for the duration of this incident. The weather on this night was windy and in the mid to low 30 degrees. When Plaintiff originally came out to yard, he was only wearing a thin pair of boxer shorts and T-shirt and had to endure 30 degree weather for 16 hours in only this clothing.

> While I was on the exercise yard, defendant Lt. Hubach ordered the complete removal of "all" my personal property and state property, (i.e. state issue, clothing, sheets, blankets, toilet paper, hygiene, inter alia). ... This action by defendant Hubach also prevented me from later self decontaminating since I was denied proper decontaminating.

> In the late evening hours of March 15, 2008, I asked both defendant Hubach and defendant LaTraille if we were going to be fed or given any sort of clothing items to keep us warm and I was told that we "didn't have anything" coming unless we stripped out.

> Plaintiff's entire body, face, back, legs, genitals, and anus were completely saturated with multiple canisters of toxic chemicals. The sudden and drastic

change of temperature on my body from cold to burning was brutal.  My body was completely on fire!

When Plaintiff could no longer tolerate the burning, he submitted to the degrading practice defendants desired.  Thereafter, Plaintiff was stripped naked, performed the "strip search," and then given the same soaked boxer shorts to wear.  Plaintiff was . . . escorted to the front of Building 4B-3R, where I was to be decontaminated only to find that they would only consist of being sprayed with a garden hose for approximately 60 seconds outside in 30 degree cold weather.  I observed my cellmate (inmate Lerma) get sprayed with this garden hose and seen (sic) that there was not enough pressure from this hose to "remove" the pepper spray (O.C.) from my cellmates body, so it only made the chemicals smear down off his head into his eyes and instantly made my cellmate unable to see at all.  (See video tape.)  When it was my turn to be sprayed, I asked escorting staff for a shower to be properly decontaminated, but declined to be sprayed and thus blinded by the garden hose.

Plaintiff was then placed in his cell (#7) which was stripped clean of "all" articles of necessity.  Only a bare mattress was left.  Plaintiff by now could not see, his breathing was erratic, heart pounding, body twitching uncontrollably due to the effects of the toxic chemicals.  Plaintiff asked defendant Hubach for a shower to decontaminate once he realized he had nothing to self decontaminate in his cell.  But once his tray slot was closed, all staff left his cell area without any reply.  Plaintiff attempted to wash himself with water, but had no soap, nor any other means to decontaminate himself.  Plaintiff was left in his cell burning on fire for (3) days.  At no time was a shower given as mandated by prison policy. . ., although all (6) available showers in Unit 4B-3R were empty and never used.

(FAC at 11-13 ¶¶25, 26, 27.)

In his Declaration, Plaintiff asserts:

Hours later, Officer Longoria was passing out breakfast and I informed him that my body was on fire and I needed to be properly decontaminated.  I also told him I had no clean clothes or any property.  He responded that his supervisors (Jennings, Hubach, LaTraille, and Taber) said "No".  I then said, "If that's the case, can I have a piece of soap to clean myself"?  He again responded, "Our supervisors said you guys don't have sh** coming."

Several hours later, a neighbor of mine sent me a piece of soap, a clean pair of boxers and some socks.

I was not given a shower until March 19, 2008 where I was able to fully scrub and decontaminate myself.

(Pltf's Decl., ECF No. 57 at 22 ¶¶18, 19, 20.)

### 4.   Discussion

### Food

"Adequate food is a basic human need protected by the Eighth Amendment," Keenan, 83 F.3d at 1091.

Here, the parties do not dispute that Plaintiff was not given any food to eat for approximately sixteen hours beginning mid-afternoon on May 15, 2008 while he was confined outside in the exercise module, and that his next meal was breakfast served on the morning of May 16, 2008 after he was returned to his cell.

However, there is a dispute of fact whether Plaintiff asked defendants Hubach and LaTraille for food.  Defendants Hubach and LaTraille each testified that they do not recall having any contact with Plaintiff on May 15-16, 2008 before he was extracted from the exercise module, and they do not recall Plaintiff complaining to them that he required food. Plaintiff declares that he asked defendants Hubach and LaTraille if he and other inmates were going to be fed or "get some kind of lunches or something for us to eat," but acknowledges that he did not tell any of the defendants that he was hungry, faint, weak, or had a medical condition that would cause him to experience adverse symptoms from hunger.  This dispute of fact is not material to whether defendants were deliberately indifferent, because under either version of the facts, there is no evidence that defendants were aware that a substantial risk of serious harm existed because Plaintiff needed food.

Plaintiff has not met his burden to establish the existence of a genuine issue of material fact whether defendants Hubach, LaTraille, and Taber were deliberately indifferent to Plaintiff's need for food.  Plaintiff shows no evidence that he suffered any serious or lasting harm or injury from the sixteen-hour fast.  Nor does Plaintiff's evidence show that defendant Taber knew that Plaintiff was hungry, or even that Taber participated in the events at issue before Plaintiff's extraction from the exercise module.

Based on the foregoing, the court finds that Defendants' motion for summary judgment on Plaintiff's claim against defendants Hubach, LaTraille, and Taber for subjecting him to adverse conditions of confinement by withholding food should be granted in favor of defendants Hubach, LaTraille, and Taber.

### ***Clothing Appropriate for Cold Weather***

The denial of adequate clothing may, under certain circumstances, rise to the level of an Eighth Amendment violation.  Hoptowit v. Ray, 682 F.2d 1237, 1246 (9th Cir. 1982).  The

parties do not dispute that Plaintiff was wearing only boxers, a T-shirt, and shoes when he was housed outside on the SMY between mid-afternoon on March 15, 2008 and the morning of March 16, 2008.  However, they disagree about the weather conditions during that period of time and whether Defendants knew that Plaintiff was so cold that he was at risk of suffering serious harm.

Plaintiff declares that the weather on that night was windy and in the mid to low 30 degrees, that he told defendant Hubach he was cold, and that Hubach responded by saying, "You guys don't have anything coming unless you strip out."  Plaintiff declares that he asked defendant Hubach if he and other inmates were going to get any blankets, that he was denied blankets and warm clothing, and that he was forced to endure 16 hours in "freezing" cold without adequate clothing.  Plaintiff acknowledges, however, that he did not tell any of the defendants he was suffering adverse effects from the cold such as fainting or that he had a medical condition that required him not be exposed to certain temperatures.  Defendants argue that Plaintiff's assertion that the weather was in the mid to low 30's is not supported by the conditions visible in the video recording of Plaintiff's extraction.  Defendants assert that the video shows no evidence that it was windy, nor that it was cold enough to see people's breath in the air when they spoke, or that it had snowed.

Even taking Plaintiff's allegations as true, Plaintiff's assertion, without factual support, that the temperatures were near or below 30 degrees for 16 hours does not establish a fact.  The court finds that Plaintiff fails to establish a triable issue of fact whether defendants were deliberately indifferent.  Plaintiff's testimony that the weather was windy and he told defendant Hubach that he was cold is not sufficient to show that any of the defendants knew about and disregarded a substantial risk of serious harm to Plaintiff.  Moreover, there is no evidence that Plaintiff was injured by his exposure to cold temperatures.

Based on the foregoing, the court finds that Defendants' motion for summary judgment on Plaintiff's claim against defendants Hubach, LaTraille, and Taber for subjecting him to adverse conditions of confinement by failing to provide him with adequately warm clothing should be granted in favor of defendants Hubach, LaTraille, and Taber.

### *Inadequate Decontamination*

Delays in providing showers and medical attention for inmates suffering from harmful effects of pepper spray may violate the Eighth Amendment.  <u>Clement v. Gomez</u>, 298 F.3d 898, 905-06 (9th Cir. 2002).

The issue here is whether an issue of material fact exists as to whether Defendants acted with deliberate indifference in failing to adequately decontaminate him.  The parties do not dispute that Plaintiff was thoroughly sprayed with pepper spray, that Plaintiff was briefly rinsed with a water hose and declined further rinsing at that time, that Plaintiff did not request medical care, that a sink with running water was available in Plaintiff's cell, that later in the day another inmate gave Plaintiff soap, clean boxers and socks, and that Plaintiff was not allowed to take a shower until three days later on March 19, 2008.  Plaintiff testified that he asked defendant Hubach for a shower when he was returned to his cell after being pepper sprayed, and was denied.  Plaintiff also testified that the sink in his cell only provided a small stream of water, and he had no plug or cup to contain the water, so was unable to properly decontaminate in his cell.  Plaintiff also testified that after he was pepper sprayed, he could not see, his breathing was erratic, his heart pounded, his body twitched, and for one whole day he felt a burning sensation as if "on fire."  The court finds that Plaintiff fails to establish a triable issue of fact whether defendants were deliberately indifferent.  Plaintiff's testimony that he was in pain from being covered in pepper spray and merely asked for a shower is not sufficient to show that any of the defendants knew about and disregarded a substantial risk of serious harm to Plaintiff.  Moreover, there is no evidence that Plaintiff was injured by his exposure to cold temperatures.

Based on the foregoing, the court finds that Defendants' motion for summary judgment on Plaintiff's claim against defendants Hubach, LaTraille, and Taber for subjecting him to adverse conditions of confinement by failing to provide him with the means to decontaminate from exposure to pepper spray should be granted in favor of defendants Hubach, LaTraille, and Taber.

///

///

1

### D.   Qualified Immunity

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Even where the defendant moves for summary judgment on qualified immunity grounds, the plaintiff bears the burden of proving that the right allegedly violated was clearly established at the time of the alleged misconduct. See LSO, Ltd. v. Stroh, 205 F.3d 1146, 1157 (9th Cir. 2000).

Courts generally engage in a two-part analysis in determining whether qualified immunity should apply. Tolan v. Cotton, 134 S.Ct. 1861, 1865 (2014). A court must first determine whether the facts, "[t]aken in the light most favorable to the party asserting the injury, ... show the officer's conduct violated a [federal] right[.]" Id. (quoting Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151 (2001)).

"The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation." Id. at 1866 (citing Hope v. Pelzer, 536 U.S. 730, 739, 122 (2002)). State actors are "shielded from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Id. (citation and internal quotation marks omitted). "[T]he salient question ... is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged [conduct] was unconstitutional." Id. (internal quotation marks and citation omitted). This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." Saucier, 533 U.S. at 201. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of the pre-existing law the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640 (1987).

As discussed above, the Court finds that none of the Defendants violated Plaintiff's constitutional rights. Therefore, the issue of qualified immunity shall not be addressed.

///

## V.    CONCLUSION

Based on the foregoing, **IT IS HEREBY ORDERED** that:

1.     Defendants' motion for summary judgment, filed on February 17, 2015, is GRANTED; and

2.     The Clerk is directed to enter judgment in favor of Defendants and close this case.

IT IS SO ORDERED.

Dated:   **September 30, 2015**                    **/s/ Gary S. Austin**
                                                       UNITED STATES MAGISTRATE JUDGE